**UNITED STATES of America,**
**Appellee,**

v.

**John Carl SPARANO, Defendant-Appellant.**

**No. 538, Docket 34255.**

United States Court of Appeals,
Second Circuit.

Argued Feb. 5, 1970.

Decided March 3, 1970.

James M. LaRossa, New York City, for defendant-appellant.

Lawrence G. Soicher, Asst. U. S. Atty., Eastern District of New York (Edward R. Neaher, U. S. Atty., Eastern District of New York, on the brief), for appellee.

Before WATERMAN and ANDERSON, Circuit Judges, and BARTELS, District Judge.*

ANDERSON, Circuit Judge:

John Carl Sparano appeals from his conviction by the court and jury on two counts of knowing possession and concealment of counterfeit $20 Federal Reserve Notes, in violation of 18 U.S.C. §§ 472 and 2, for which he was sentenced to concurrent five-year sentences. We affirm.

There was testimony from which the jury could have found the following facts: On the evening of August 4, 1967, a Secret Service undercover agent and one Erani met with Joseph Abbate in an unmarked government car at the corner of Avenue X and East Third Street in Brooklyn at about 8:30 p. m., to purchase an order of counterfeit $20 bills. The agent arranged to pay $240 for $1000 of the counterfeit money, and he delivered $140 in marked currency to Abbate as an advance payment.

Abbate left the car and walked a block to the corner of Avenue X and East Second Street, where he spoke to a confederate, Daniel Tarlen. Then Abbate returned to the government car to wait, while Tarlen drove away with another person in a dark colored 1963 Cadillac bearing license plate BK-7045. Tarlen returned to the government car alone, some fifteen minutes later, and handed the Secret Service agent fifty counterfeit bills, all bearing the same serial number. At a prearranged signal, five other agents, who had been watching, closed in and arrested both Abbate and Tarlen.

Abbate and Tarlen were taken to Secret Service Headquarters in Manhattan. Three of the agents returned to the block of East First Street between Avenue X and Avenue W, in Brooklyn, where they sighted the same Cadillac, with the identified license plate, parked in front of a house at 2336 East First Street. After speaking briefly with two boys sitting on the steps of a nearby house, at approximately 11:00 p. m. the agents, with guns drawn, knocked on Sparano's door and identified themselves to the appellant when he opened it. Sparano at once tried to slam the door shut, but the agents forced their way into the house and placed him under arrest. They searched Sparano in the living room, where they had seized him, and found in his pocket the $140 in marked bills which had been delivered to Abbate earlier that evening. Others in the house at the time included one of Sparano's brothers, his father, who was asleep, his mother and three of his friends, including the owner of the Cadillac.

The agents then searched only those portions of the house which Sparano's mother told them were occupied by him. These consisted of a basement bedroom and a portion of a dresser in another bedroom, fifteen to twenty feet distant from the place in the living room where Sparano was arrested, used by Sparano's sister, who was away for the summer. The search of the dresser drawer disclosed seventy-six additional counterfeit bills, fifty of which bore the same serial number as those delivered by Tarlen to the undercover agent.

Sparano, Tarlen and Abbate were indicted together; but Tarlen's case was severed when he was committed for treatment under the Narcotics Addict

---

* Of the Eastern District of New York, sitting by designation.

Rehabilitation Act of 1966. Abbate entered a plea of guilty to one count of the indictment immediately before the trial began.

Sparano moved to suppress the counterfeit bills found in his dresser drawer as the product of an unconstitutional search; but the court ruled that the search for specific evidence in only those portions of the house, which the appellant's mother identified as used by him, was reasonable under the circumstances as incident to a valid arrest. It rejected, however, the prosecution's alternative argument that Mrs. Sparano had consented to a search by designating her son's sleeping quarters and dresser. At the trial, over the defendant's renewed objection, the counterfeit notes were admitted into evidence. This constitutes one of the two principal points presented on this appeal; the other is the defendant-appellant's claim that his Sixth Amendment right to be confronted with the witnesses against him was also violated.

With regard to appellant's Fourth Amendment claim it should first be noted that the search in question took place on August 4, 1967, so that the standards enunciated in Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L. Ed.2d 685 (1969), do not apply because the holding of that case is not retrospective in its effect. United States v. Bennett, 415 F.2d 1113 (2 Cir.1969). As the Court noted in *Chimel,* 395 U.S. at 755, 89 S.Ct. 2034, 23 L.Ed.2d 685, its prior decisions outlining the permissible scope of a warrantless search were "far from consistent." But whatever the nature of these fluctuating contours, the instant case did not involve the sort of routine, wholesale, exploratory search of rooms, in addition to the one in which the arrest occurred, which was held objectionable under pre-*Chimel* standards. See Von Cleef v. New Jersey, 395 U.S. 814, 89 S.Ct. 2051, 23 L.Ed.2d 728 (1969). The agents, who searched Sparano's person, after a concededly valid arrest, found marked bills in his pocket which confirmed their belief that he was the supplier of the counterfeit money they had already seized. Under the circumstances, it was reasonable to suppose that Sparano had other counterfeit bills at his quarters; and, in the light of the then governing cases, the agents did not overstep the limits of their authority by ascertaining the particular areas of the house where the appellant's belongings were kept, and by searching them for this specific evidence. Counterfeit money is the kind of evidence which might easily be destroyed. Others, possible confederates, were present in the house, including the owner of the automobile used by Tarlen earlier in the evening. It was not necessary for the agents to leave the house with Sparano, attempt to obtain a search warrant late at night, and return. See United States v. Rabinowitz, 339 U.S. 56, 70 S.Ct. 430, 94 L. Ed. 653 (1950); Harris v. United States, 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399 (1947); United States v. Francolino, 367 F.2d 1013 (2 Cir.1966). The seventy-six counterfeit bills discovered in the dresser were, therefore, properly admitted as evidence at the trial.

Appellant's claim that his Sixth Amendment right to be confronted with the witnesses against him was violated is based in part upon a portion of the assistant district attorney's opening statement and in part upon a question and answer on direct examination of Special Agent Walsh of the United States Secret Service, when he was testifying on behalf of the Government. In his opening statement the prosecutor had recounted the facts and events which led up to and included the arrest of Abbate and Tarlen. He then said:

"At the Secret Service office in Manhattan, Mr. Tarlen had a conversation with one of the arresting agents. As a result of that conversation, three Special Agents of the Secret Service went to a location in Brooklyn which was very near the earlier scene where the counterfeit money had passed to

the government agent. After the three government agents went to this locale, a neighborhood inquiry was made and it was determined that the man they sought was the defendant John Carl Sparano. After that was determined, the agents proceeded a very short distance to the house which was determined to be his, and parked directly in front of that house was a 1963 black Cadillac automobile, bearing license plate BK–7045, the same car that was sited [sic] earlier transporting Mr. Tarlen from the scene of the passing of the counterfeit notes."

At the end of the prosecutor's opening statement defense counsel moved for a mistrial on the ground that the jury might infer that Tarlen, who was not available for cross-examination, had identified Sparano as the supplier of the fifty counterfeit bills which Tarlen had turned over to the Secret Service agent. The court denied the motion. During the presentation of the Government's case, the prosecutor in his direct examination of Agent Walsh sought to bring out conversations at Secret Service Headquarters between the arresting agents and Abbate and Tarlen after they had been taken into custody.[1] Counsel for the defendant objected and no testimony was given about the conversations.

The direct examination of Agent Walsh continued as follows:

"Q. Would you tell us please what if anything occurred from the time that you went to this locale with Agents D'Amelio and Marchitello up until the time that you stated the arrest of the defendant Sparano was made? A. In front of this address, as I stated, 2336 East First Street, we observed a black or dark Cadillac, 1963, bearing New York license plates BK–7405. We also spoke briefly with two boys who were sitting on the steps of a house on the same side of the street as 2336, perhaps two or three doors down the street.

Q. Did you have an occasion to describe an individual whom you sought at that time to those people? A. I did.

Q. Would you tell us what their response, if any was?

Mr. La Rossa: I object to the question."

---

1. This examination was as follows:

"Q. If I may just take you back for a moment. At the time you made the arrest of Mr. Abbate and Mr. Tarlen, was anything said by either you or the other agents to either of these two men?

Mr. La Rossa: I object to that question.

The Court: In the circumstances, I think it is unnecessary, if it is the one that I anticipate.

Mr. Soicher: That is correct, your Honor.

Q. All right. Would you tell us— did there come a time when you took Mr. Abbate and Mr. Tarlen back to the Secret Service office in Manhattan? A. We did.

Q. All right. Now, at that office, did there come a time—

The Court: Well—

Mr. La Rossa: I object to anything that happened in that office.

The Court: I think you can skip that whole episode, Mr. Soicher.

Do you want to discuss it?

Mr. Soicher: May I, your Honor? (The following is a side bar held outside of the hearing of the jury.)

The Court: Because of Bruton, I think you can't be in a position of having it seem that either Mr. Tarlen or Mr. Abbate said that Mr. Sparano is your man because even if you do that, it would be tantamount to implying they are offering accusatory statements against Sparano. There, you have to do without their actual conversations anyhow. But, if you just say to them—if you simply say 'Later on that evening, did you return to the area'—

Mr. Soicher: Yes. Well, can I at least establish that there was a conversation?

The Court: No. You see, that is where the risk arises, because the conversation followed by the visit to the area—it fingers Sparano as being a person accused by one or both."

The court then took a recess and the jury left the courtroom; but counsel and the court engaged in a lengthy colloquy which concerned the prosecutor's right to go into the conversations between the agents and Abbate and Tarlen at headquarters. The specific objection made to the pending question was hearsay which was later sustained. Counsel for the defendant, however, turned the discussion into a motion for mistrial on the ground that the above quoted portion of the prosecutor's opening statement and the questions and answers, disclosing that the agents had described an individual whom they sought to the two boys (which was not objected to), combined to permit the jury to infer that Tarlen had described Sparano to the agents as the man who had supplied the counterfeit notes.

The experienced trial judge gave long and careful consideration to the defense claim, in the light of Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), that Sparano's Sixth Amendment right to be confronted by the witnesses against him had been violated. *Bruton* held that testimony by a postal inspector about a confession by one co-defendant, who did not take the witness stand, which implicated the other co-defendant in perpetration of armed postal robbery, was inadmissible hearsay against that other co-defendant, and violated his right of cross-examination, despite the court's instruction to the jury that the testimony as it concerned the other co-defendant must be disregarded.

The issue in the present case is whether or not there is a fall-out area emanating from the *Bruton* holding which covers any inference the jury might possibly draw of accomplices pointing a finger of guilt at the defendant from (1) the fact that arresting officers had contact with and conversed with the defendant's co-indictees, whom they had arrested, and (2) the fact that they later procured some evidence against the defendant. The trial judge

concluded that, while there might be a *Bruton* violation flowing from an inference, the possibility of the jury's drawing such an inference in this case was altogether too remote and speculative. We agree and hold that, to constitute a violation, the inference would have to be clear and practically inescapable.

As far as the opening statement was concerned, both counsel in argument and the court in its charge emphasized that the statement was not evidence and was not to be taken as evidence. This instruction is one which the jury could understand and follow and it is to be assumed that they did so. See *Bruton, supra* at p. 135, 88 S.Ct. 1620, 20 L.Ed.2d 476. From the interrogation of the witnesses at the trial the jury could have surmised, from excluded questions asked by the prosecutor, that some conversation took place at the headquarters between the agents and Abbate and Tarlen, but here again, the court specifically charged the jury that where an objection to a question had been sustained, they were to disregard the question and draw no inferences from its wording about the answer that might have been given. It is not reasonable to suppose that the members of the jury would disregard a clear, simple direction of this kind and speculate about the wording of the question and what inferences could be drawn from it in their deliberations. The only evidence on this issue before the jury was Agent Walsh's testimony that the agents gave the description of someone they were looking for to the two boys sitting on the steps and they thereafter went to the house, in front of which the dark colored Cadillac, New York license No. BK–7045 was parked, and rapped on the door which was opened by Sparano.

To formulate a *Bruton* violation out of what had transpired before them, the jury, in disobedience to the court's charge, would have to find that the agents had a conversation with Abbate and Tarlen at headquarters about the

supplier of the counterfeit bills. While it would be natural to assume that there had been some speech between the arresting officers and their prisoners, there is no evidence at all of any interrogation about a supplier of the bills. The appellant asserts the jury could infer this from the fact that when the agents spoke to the two boys they had a description of Sparano—something also inferred from the fact that they were looking for him and after talking to the two boys, went to Sparano's house. But as the trial judge pointed out there were several possible sources through which a description of Sparano could have been obtained beside that of Abbate and Tarlen. There was a confidential informant in the case, as testified to by Agent Ward, who may have been the source. For all the jury knew, Ward, himself, may have seen the supplier while acting as an accomplice. The agents may have picked up a description of someone who appeared to be a source of counterfeit bills, while they were in the preliminary stages of investigation.

██ The trial judge wisely refrained from giving any specific instruction to the jury with regard to drawing an inference that Abbate or Tarlen had given a description of Sparano to the agents as the supplier and was, therefore, the guilty man. The possibility of such an inference was so remote and so unlikely that a special charge focusing attention upon it would have given it an undue emphasis, leading to further speculation and confusion and ultimately resulting in the bringing about of the very injustice *Bruton* sought to eliminate.[2]

The judgments of the district court are affirmed.

---

2. Considering the circumstances of this case, we do not feel it necessary to discuss the overwhelming evidence of guilt as it might bear upon the claim of a *Bruton* violation. But see Harrington v. California, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969); Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).