**UNITED STATES of America,
Appellee,**

v.

**Thomas KEE MING HSU, Defendant-Appellant.**

**Nos. 469, 470, Dockets 32258, 34193.**

United States Court of Appeals,
Second Circuit.

Argued Jan. 15, 1970.

Decided April 20, 1970.

Peter L. Truebner, Asst. U. S. Atty., New York City (James D. Zirin, Asst. U. S. Atty., and Robert M. Morgenthau. U. S. Atty. for Southern District of New York, New York City, on the brief), for appellee.

Herbert L. Awe, Washington, D. C., for defendant-appellant.

Before MEDINA, WATERMAN and SMITH, Circuit Judges.

MEDINA, Circuit Judge:

We have before us here two appeals by the defendant, Thomas Kee Ming Hsu. The first appeal is from his conviction on eleven counts of a twelve-count indictment charging him with wire fraud, causing the interstate travel of a victim in execution of a fraudulent scheme, and causing the interstate transportation of money taken by fraud, in violation of 18 U.S.C. Sections 1343 and 2314. This appeal raises no question of the sufficiency of the evidence to support the charges but principally attacks what is said to be an unlawful search and seizure, in violation of his Fourth Amendment rights, at the time of his arrest by F.B.I. Agents at his apartment in Riverdale, New York at 5 p. m. on November 22, 1965 in execution of a bench warrant issued earlier that afternoon. There was no search warrant. Hsu also claims that the use of certain evidence obtained in this search violated his privilege against self-incrimination under the Fifth Amendment. The second appeal is from an order denying Hsu's motion under Fed.R. Crim.P. 35 to suspend or reduce his sentence of eight years' imprisonment imposed by Judge McGohey after a lengthy trial.

The fraudulent scheme executed by Hsu was so bizarre and improbable that until after one has scrutinized the abundance of evidence of Hsu's ingenious methods of operation the whole thing seems incredible. And yet, over a period of four years, he managed to extract from his victims no less a sum than $170,000. How did he accomplish this feat?

Hsu sized up his victims with deliberation and let the impression of his extremely persuasive personality sink in long before he approached the subject of money. His apparatus alone were impressive: a large Cadillac automobile with diplomatic license plates and a police siren, a loaded revolver in a shoulder holster which he made no effort to conceal, and photographs of him with Generalissimo Chiang Kai-shek, the President of the Republic of China, apparently reviewing troops. He represented to his victims that he had been a general in the Nationalist Chinese Army, a bodyguard of Generalissimo Chiang Kai-shek, and that he was on intimate terms with the Generalissimo and with Madame Chiang, his wife. He also claimed to be a member of the diplomatic staff of the Republic of China and a man of extraordinary accomplishments in assisting the United States Government which had awarded him the Congressional Medal of Honor.

At the appropriate time, and in a burst of confidence, he would disclose the supposed fact that Generalissimo Chiang Kai-shek was really a prisoner of his own people in Taiwan and that the struggle for power involved his son and perhaps even Madame Chiang. Therefore, some years before, the story went, Chiang Kai-shek had entrusted Hsu with negotiable American securities and jewels, the value of which was variously represented to be worth from between one hundred million dollars to almost one billion dollars, and all of this fortune was in a safe-deposit box in Taiwan to which only Hsu had access. Hsu purportedly had been deputized by Chiang Kai-shek to get this huge fortune to the United States and hold it for safekeeping until the Generalissimo arrived. In the meantime, Hsu was given full power to use as much of the fund as he needed to compensate those who gave much-needed assistance to accomplish the mission. Needless to say, the entire story was a hoax.

The sums obtained from the victims varied substantially in amount, and so did Hsu's stories about his financial requirements. Many of his needs, as he described them, had to do with trips to the Orient, the bribery of Chinese officials, and so on.

We think this is a sufficient background for understanding what occurred in Hsu's apartment on November 22, 1965.

At the entrance door to the apartment, F.B.I. Agent Edgar N. Best immediately put Hsu under arrest and gave him the full *Miranda* warnings. In his testimony at the pretrial suppression hearing before Judge Sugarman, Agent Best testified that his first concern was to locate any weapons, especially the loaded revolver which Hsu had shown to the various victims. So Agent Best asked Hsu where he kept his pistol, and Hsu replied, "I'll show you." They then walked down a corridor or hallway a distance of some 30 feet and turned to a cupboard. As Hsu was reaching into the cupboard, Agent Best put his arm in first and brought out a shoulder holster containing a loaded .38 caliber revolver. There was a bedroom about four or five feet from the cupboard, and by the time Agent Best took into his possession the loaded revolver Hsu had backed into the doorway of this room, which, as Agent Best discovered by asking him, turned out to be Hsu's bedroom and office. As Agent Best proceeded to unload the weapon, he and Hsu found themselves in the bedroom. This room contained a desk on the surface of which numerous papers were lying, all of which Hsu said belonged to him, also a bureau and a number of flight bags. As Agent Best looked down at the top of the desk, he immediately observed what appeared to be a black .25 caliber automatic. This turned out to be "one of those lighter type things" and not a real pistol, but it might have been seized by Hsu and used to hold the agents at bay and give him a chance to escape. No other weapons were found on Hsu's person.

Agent Best, aided by Agent Hansen, then proceeded to search the contents of the bedroom, taking about an hour and

fifteen minutes to do so. Thus they found and seized: another shoulder holster and a hip holster, neither of which contained any weapon, several phony photographs of Hsu and Generalissimo Chiang Kai-shek, a pistol permit, Hsu's United States passport, a brown envelope marked "Max," which concerned Max Ruderian, one of the victims, and several wire communications, telegrams, and receipts, all clearly related to the crimes charged in the indictment. During this search, Hsu was permitted to and did speak with his lawyer over the telephone.

There was no general ransacking or rummaging about in the apartment as a whole although Agent Best took a quick look around to see if a fugitive from justice, who appeared in one of the miscellaneous photographs that were found, might possibly be in the apartment.

## I.

■ We find no infringement of Hsu's constitutional rights under the Fourth, Fifth, or Sixth Amendments. Hsu's admissions on the occasion of the search were made voluntarily; he appeared quite willing to cooperate with the agents after he had been advised that he could remain silent, that whatever he said could be used in court against him, that he had the right to have a lawyer present or, if he could not afford a lawyer one would be provided without expense to him. Furthermore, when Hsu indicated he wanted to call his lawyer, he did so without any hindrance by the Agents.

■ Thrown in for good measure is a claim that the arrest was only a pretext to justify the search. This more or less common assertion in this type of case is made up out of whole cloth. There is not a scintilla of proof in the record to sustain this charge. The bench warrant was issued between 2 and 3 p. m. on November 22, 1965, and the arrest was made at Hsu's apartment in Riverdale at 5 p. m. There was no delay, and Agent Best testified that he thought the most likely place to find Hsu was at his home.

■ Moreover, as the search and seizure occurred in 1965, Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L. Ed.2d 685 (1969) does not apply. See United States v. Bennett, 415 F.2d 1113 (2d Cir. 1969); see also United States ex rel. Angelet v. Fay, 333 F.2d 12 (2d Cir. 1964), aff'd 381 U.S. 654, 85 S.Ct. 1750, 14 L.Ed.2d 623 (1965). Even if *Chimel* were applicable, we think the search was proper because it covered "the area from within which he [Hsu] might have obtained either a weapon or something that could have been used as evidence against him." 395 U.S. at 768, 89 S.Ct. at 2043. Although the arrest was at the entrance door to the apartment, it would be unreasonable to restrict the search to the area immediately adjacent to the entrance door in view of the fact that the request for Hsu's weapon led to the cupboard and to the combined bedroom and office, where the lighter that resembled an automatic pistol was lying on the desk. In any event, it is clear that the search was well within the scope of the rulings in Harris v. United States, 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399 (1947) and United States v. Rabinowitz, 339 U.S. 56, 70 S. Ct. 430, 94 L.Ed. 653 (1950). Cf. United States v. Sparano, 422 F.2d 1095 (2d Cir. 1970). By no stretch of the imagination can it be considered a general exploratory search of the kind condemned in Von Cleef v. New Jersey, 395 U.S. 814, 89 S.Ct. 2051, 23 L.Ed.2d 728 (1969); United States v. Lefkowitz, 285 U.S. 452, 52 S.Ct. 420, 76 L.Ed. 877 (1932); and Go-Bart Importing Co. v. United States, 282 U.S. 344, 51 S.Ct. 153, 75 L.Ed. 374 (1931).

■ Having concluded that the search was incidental to a lawful arrest both under *Chimel* and prior law, the next question we must consider is whether the items taken in the course of the search were properly seized. The photographs, the gun, the holsters, and the telegrams were integral parts of Hsu's scheme to persuade his victims that he was an intimate of Generalissimo Chiang Kai-shek. See, e. g., Harris

v. United States, *supra,* 331 U.S. at 153–154, 67 S.Ct. 1098; Agnello v. United States, 269 U.S. 20, 30, 46 S.Ct. 4, 70 L.Ed. 145 (1925). The other items seized, especially the passport and the papers relating to Max Ruderian, were evidence of the crime. See Warden, Md. Penitentiary v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967). Although the seizure occurred before Warden v. Hayden was decided, and at a time during which "mere evidence" seized in a search conducted pursuant to a lawful arrest was not admissible, see United States v. Lefkowitz, 285 U.S. 452, 465–466, 52 S.Ct. 420 (1932), the trial occurred after the decision in *Hayden;* and the evidence seized was therefore admissible. See United States v. Wild, 422 F.2d 34 (2d Cir.), petition for cert. filed, 38 U.S.L.W. 3410 (U.S. March 4, 1970) (No. 1278); United States v. Bennett, 409 F.2d 888, 896–897 (2d Cir.), cert. denied sub nom. Haywood v. United States, 396 U.S. 852, 90 S.Ct. 113, 24 L.Ed.2d 101, rehearing denied, 396 U.S. 949, 90 S.Ct. 376, 24 L.Ed.2d 256 (1969).

Hsu also asserts that the use of the photographs violated his Fifth Amendment privilege against self-incrimination because they were subjected to expert analysis which indicated that they had been doctored, and testimony to that effect was introduced over objection at the trial. Hsu attempts to support this contention by classifying the photographs as "private papers" which he was compelled to surrender to the F.B.I. Agents.

■ We reject this bootstrapping argument. By convenient use of labels Hsu has endeavored to impart the sanctity of "private papers" to photographs which were nothing more than instrumentalities of his crime. As seizure was proper, the testimony was admissible and did not infringe Hsu's privilege against self-incrimination. See United States v. Bennett, *supra,* 409 F.2d at 895–896. We see no analytical difference between the testimony given in this case and that given as the result of analyzing handwriting exemplars or specimens of blood taken from a defendant.

See Gilbert v. California, 388 U.S. 263, 266–267, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967); Schmerber v. California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966).

## II.

Hsu also asks us to vacate his sentence and order a remand because at the time of his sentencing he was denied access to the pre-sentencing report prepared by the Probation Office for the use of the District Judge. A timely motion under Fed.R.Crim.P. 35 was made to reduce or suspend the sentence, and the motion was denied.

At the time of sentencing, on March 5, 1968, the following colloquy occurred between Hsu's lawyer and Judge McGohey:

Mr. Goldberg: * * *

He has no previous record. Now, the probation report, I am sure, should attest to the fact that this defendant has been of great service to a number of law enforcement agencies of the United States Government. I have been in touch with Agent Feldman, Agent Best—

The Court: I wouldn't press that first one.

Mr. Goldberg: I trust that the matters dealing with the defendant have been set forth in the probation report.

The Court: I wouldn't press that first reference if I were you.

Mr. Goldberg: Your Honor, I know—

The Court: Or any of the others, for that matter.

Although Hsu previously was enlarged on $10,000 bail, Judge McGohey ordered him remanded after a further colloquy during which the prosecutor stated that Hsu "told at least two persons that he intends not to go to jail."

The motion to reduce or suspend Hsu's sentence, made on December 11, 1968 pursuant to Fed.R.Crim.P. 35, was based on Hsu's alleged assistance to various Government agents as an informer. The motion requested a hearing *in cam-*

*era* to determine the degree of assistance Hsu provided. The motion was denied summarily by Judge McGohey, who stated:

He [Hsu] urges as a basis for relief, alleged assistance to government agents in various pending cases. It is not necessary to decide the value, if any, of his efforts because, in any event, the court is persuaded that the original sentence should not be modified or suspended.

◼ We find no error in Judge McGohey's refusal to permit Hsu or his lawyer to examine the pre-sentence report. This Court and others have held that to permit or to refuse such examination lies within the discretion of the trial judge.[1] We find no abuse of discretion here.

Judge McGohey had ample opportunity to observe Hsu as he testified at considerable length during the trial. The proof of his various expedients to deceive his victims and of his threats of dire consequences should these victims disclose what they knew to law-enforcement officers after the scheme fell of its own weight was abundant and convincing. It is a fair inference that Judge McGohey thought Hsu was an unprincipled scoundrel who well deserved the sentence imposed upon him, regardless of any assistance he may or may not have rendered to the Government as an informer. The cases upon which Hsu relies, i. e., Townsend v. Burke, 334 U.S. 736, 68 S.Ct. 1252, 92 L.Ed. 1690 (1948) and Baker v. United States, 388 F.2d 931 (4th Cir. 1968), are clearly distinguishable.

The judgment and order are affirmed.

1. See Fed.R.Crim.P. 32(c) (2); United States v. Crutcher, 405 F.2d 239, 245 (2d Cir. 1968), cert. denied, 394 U.S. 908, 89 S.Ct. 1018, 22 L.Ed.2d 219 (1969); United States v. Fischer, 381 F.2d 509, 511–513 (2d Cir. 1967), cert. denied, 390 U.S. 973, 88 S.Ct. 1064, 19 L.Ed.2d 1185 (1968); United States v. Trigg, 392 F.2d 860, 864 (7th Cir.), cert. denied, 391 U.S. 961, 88 S.Ct. 1863, 20 L.Ed.2d 874 (1968); Thompson v. United States, 381 F.2d 664, 666–667 (10th Cir. 1967); Roeth v. United States, 380 F.2d 755, 757 (5th Cir. 1967), cert. denied, 390 U.S. 1015, 88 S.Ct. 1266, 20 L.Ed.2d 165 (1968); Bannister v. United States, 379 F.2d 750, 754 (5th Cir. 1967), cert. denied, 390 U.S. 927, 88 S.Ct. 861, 19 L.Ed.2d 988 (1968); United States v. Weiner, 376 F.2d 42 (3d Cir. 1967); 8A J. Moore, Federal Practice ¶ 32.03 [4] (2d ed. 1969). Cf. United States v. Holder, 412 F.2d 212, 215 (2d Cir. 1969).