UNITED STATES of America,
v.
James MAROTTA, Defendant.
No. 70 Cr. 277 D.N.E.

United States District Court,
S. D. New York.
May 10, 1971.

378

Whitney North Seymour, U. S. Atty., by John Gross, Asst. U. S. Atty., for plaintiff.

Theodore Krieger, New York City, for defendant.

EDELSTEIN, District Judge.

## OPINION

The indictment in this case charges the defendant in three counts with violation of the National Firearms Act Amendments of 1968, 26 U.S.C. § 5801 et seq. (1964), *as amended* (Supp. V, 1970). Count one charges him with having engaged in business as a dealer in firearms without having paid the special occupational tax required by 26 U. S.C. § 5801 (1964), *as amended* (Supp. V, 1970), and without having registered as a dealer in firearms as required by 26 U.S.C. § 5802 (1964), *as amended* (Supp. V, 1970). Count two charges the defendant with having received and possessed a firearm that was not registered to him in the National Firearms Regis-

tration and Transfer Record. Count three charges him with having transferred a firearm in violation of 26 U.S. C. §§ 5811, 5812 (1964), *as amended* (Supp. V, 1970). The case presently is before the court on a motion by the defendant for an order that various firearms seized from defendant's apartment be suppressed as evidence.[1]

On September 9, 1969, Kenneth Coniglio, a Special Investigator with the Alcohol and Tax Division of the United States Treasury Department, Internal Revenue Service, armed with an arrest warrant and accompanied by Donald Zimmerman, his Area Supervisor, and by three Housing Authority police officers, went to the defendant's apartment, there placed him under arrest and seized the firearms which defendant moves to suppress. The Government concedes that the arrest warrant carried by Agent Coniglio was invalid, but it contends that the arrest itself was valid nonetheless because the agents had probable cause to believe that the defendant had committed a felony.[2] The defendant does not make an issue of the propriety of the arrest. He concedes for purposes of this motion that there was probable cause to make it. He does make an issue of the propriety of the seizure of the firearms in light of the admitted fact that the agents did not have a search warrant.

The testimony reveals that on September 9, 1969, defendant resided with his parents and brother in a five-room apartment in the Bronx. When the agents arrived at the apartment defendant and his father were in a bedroom watching television; defendant's brother admitted the agents into the entrance area of the apartment. Defendant and his father then emerged from the bedroom. Agent Coniglio asked for James Marotta, and when defendant identified himself, the agent told defendant that he

1. A full hearing on this motion was held on June 15 and June 16, 1970. However, the Government did not file its proposed findings of fact until November 10, 1970, and the defendant did not file his pro-

posed findings of fact and brief in support of his motion until February 24, 1971.

2. *See* 26 U.S.C. § 7608(a) (3) (1964).

had a warrant for his arrest. Defendant then was placed under arrest and was told that he was being arrested in connection with the illegal sale of firearms.

Agents Coniglio and Zimmerman and defendant's parents as well as the defendant testified at the hearing held in connection with this suppression motion. The testimony of these witnesses as to what had occurred in defendant's apartment on September 9, 1969, until the defendant was placed under arrest is fairly well in accord. Their testimony as to the events which immediately followed defendant's arrest, however, is not in accord.

Agent Coniglio testified that after placing defendant under arrest he advised defendant of his constitutional rights by giving him all of the warnings required by the *Miranda* decision.[3] Defendant stated that he did not want a lawyer and that he would speak to Agent Coniglio. He admitted having sold a pistol to one Enrique, who, unbeknownst to defendant, had acted as an informant for the Government in the past. Agent Coniglio then asked defendant if he had any guns on the premises and told him "that he should give them to me if he did." According to Agent Coniglio, after defendant indicated that he did have guns, they went into defendant's bedroom where he produced three guns which are the subject of this suppression motion.

Agent Zimmerman's testimony agrees with Agent Coniglio's. Agent Zimmerman did not testify, however, as to what had occurred in defendant's bedroom since he was not present there when defendant turned the guns over to Agent Coniglio.

Defendant's version of these facts differs. He testified that when he first saw Agents Coniglio and Zimmerman they had their guns drawn. The guns were not pointed at anyone nor was the exposure of the guns, which lasted for only about a minute, accompanied by any threats. Defendant further testified that the agents did not warn him of his constitutional rights in his apartment. Rather, after placing him under arrest Agent Coniglio asked defendant where his bedroom was. Defendant indicated the way and Agent Coniglio went into the bedroom with defendant, holding defendant's arm along the way. Once inside the bedroom, Agent Coniglio told defendant that "If you have any other guns on the premises, give them to me before I search and find them and hold your parents responsible." Accordingly, defendant removed a bag from his closet which contained guns. He handed this bag to Agent Coniglio. Agent Coniglio then looked through the drawers of defendant's dresser.

Mr. Dominick Marotta, defendant's father, testified that defendant was not advised of his constitutional rights and that the defendant immediately was asked where his bedroom was. Mr. Marotta testified further that he followed the agent and the defendant into the bedroom. There, he heard the agent ask the defendant if he had any guns, and he also heard the agent tell the defendant that if the agents had to search for guns defendant's parents would be held responsible if any were found. According to Mr. Marotta, defendant's arm was not held while he was going into the bedroom.

Defendant's mother, Mrs. Josephine Marotta, testified that she was in the living room while the agents were in her apartment. According to her testimony the agents told defendant that if he had any guns he should give them to the agents otherwise they would hold her husband and her responsible. Mrs. Marotta testified that her son's arm was not held, and while she stated that her son was not informed that he had a right to a lawyer, she did say that she heard her son informed that anything he said could be used against him in a court of law.

3.  384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Neither of defendant's parents were asked whether the agents had their guns drawn. Agent Zimmerman was queried about this and he responded that none of the officers in the apartment ever drew their guns there.

The Government contends that the seizure of the guns from defendant's apartment was accomplished upon the consent of the defendant and that the motion to suppress therefore must be denied.

■■■ The principles involved in the analysis of whether consent was given are well-established. "When a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was in fact, freely and voluntarily given." Bumper v. North Carolina, 391 U.S. 543, 548, 88 S.Ct. 1788, 1792 (1968). The Government must show that the consent was unequivocal and specific and not "the product of duress or coercion, actual or implicit." United States v. Smith, 308 F.2d 657, 663 (2d Cir. 1962) *cert. denied* 372 U.S. 906, 83 S.Ct. 717, 9 L.Ed.2d 716 (1963).[4] The consent must not be illusory. When the alleged consent is considered within the context in which it was given it must prove to be more than an acquiescence or submission to authority or force. *E. g.,* Bumper v. North Carolina, *supra*; Waldron v. United States, 95 U.S.App.D.C. 66, 219 F.2d 37 (1955); United States v. Gross, 137 F.Supp. 244 (S.D.N.Y.1956). Finally and importantly, consent by a defendant to a search or seizure is not to be lightly inferred; the Government's proof must establish such consent by clear and convincing evidence. *E. g.,* United States v. Como, 340 F.2d 891 (2d Cir. 1965); United States v. Lewis, 274 F.Supp. 184 (S.D.N.Y.1967).[5]

■■ In this case the Government contends that defendant's consent to the seizure of the guns is supported by testimony that defendant indicated to Agent Coniglio that there were guns in the apartment and also that he took guns from a closet in his bedroom and turned them over to Agent Coniglio. The testimony establishes as much. But the testimony concerning all of the events which transpired in defendant's apartment and which give color to defendant's actions does not permit a finding that the Government has sustained its heavy burden of proof.

The defendant testified that Agent Coniglio told him, in substance, that he should turn over any guns he had because if the agents had to make a search and if guns were found then defendant's parents would be held responsible. The testimony of defendant's parents was to the same effect. If this is what happened the court would not find that defendant's actions were voluntarily and freely undertaken. Instead the court would find that defendant was coerced into submission by an explicit threat of dire consequences aimed at defendant's parents. *See,* Waldron v. United States, *supra,* and United States v. Gross, *su-*

4. While the rubric recited in the cases often includes the additional requirement that the consent be intelligently given, it has been held in this Circuit that a search is not *per se* invalid if it is not preceded by warnings of the defendant's Fourth Amendment rights. United States ex rel. Combs v. La Vallee, 417 F.2d 523 (2d Cir. 1969), *cert. denied* 397 U.S. 1002, 90 S.Ct. 1150, 25 L.Ed.2d 413 (1970). Defendant's position is to the contrary, but recognizing the controlling authority against him, he has not pressed this point. Just to complete the record in this regard, the court finds that prior to the seizure of the guns the defendant was not apprised of his constitutional right to refuse his consent thereto.

5. *But see* United States v. Schipani, 289 F.Supp. 43 (E.D.N.Y.1968), *aff'd.* 414 F.2d 1262 (2d Cir. 1969), *cert. denied* 397 U.S. 922, 90 S.Ct. 902, 25 L.Ed.2d 102 (1970), suggesting that in all suppression matters in federal courts the Government should be required to demonstrate beyond a reasonable doubt that the evidence obtained by it was done so lawfully.

*pra.* (acquiescence to search obtained by threats that premises would be torn apart). However, defendant's testimony in at least two important respects relevant to the issue of voluntariness was not corroborated by any of the witnesses. His testimony that the agents had their guns drawn while in the apartment, and his testimony that Agent Coniglio held his arm while they walked into the bedroom stands unsupported. This lack of corroboration makes defendant's credibility suspect.

Yet, even if the court were to reject all of the defendant's testimony, and, in addition, even if the court could deem the uncontradicted testimony of defendant's parents as to the threat aimed at them as being unreliable, the court would nevertheless have to conclude that the evidence still remaining before it is not the clear and convincing evidence required for a finding that defendant freely and voluntarily gave the guns to Agent Coniglio. Rather, what remains is the testimony of Agent Coniglio that he told the defendant that if he had any guns on the premises "he should give them to me if he did." This was not just a question put to defendant which could have been answered positively or negatively. This was an instruction, an instruction given by an agent who was accompanied by four other officers all of whom were armed even if their weapons were not drawn, and it was an instruction given at a time after the defendant had been placed under arrest expressly pursuant to the authority of a warrant (albeit invalid) obtained for that purpose. Surely one cannot say with any great confidence that defendant's response to this instruction in the circumstances represented his freely given unequivocal consent to the seizure of the guns and was not just a submission to authority. Thus even taking that view of the evidence most advantageous to the Government's cause, the Government has not sustained its heavy burden of proving by clear and convincing evidence that defendant freely and voluntarily consented to the seizure of the guns.

Having found that the seizure of the guns cannot be upheld on the ground of the defendant's consent, there still must be considered whether or not the seizure may be justified as one that was made as an incident to a lawful arrest. This issue has been discussed by the parties only in a tangential fashion, but the issue has been raised and must be determined.

█ It already has been noted that while the Government concedes the invalidity of the arrest warrant obtained by Agent Coniglio, defendant concedes that the agents had probable cause to believe that defendant had committed a felony and that the arrest, therefore, was lawful. And so the question now is whether the seizure of the guns in defendant's bedroom was permissible as being incidental to defendant's arrest in the entrance area of his apartment. The events in question having occurred on September 9, 1969, the decision of the Supreme Court in Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (June 1969) governs the determination of this issue.

In *Chimel* the Supreme Court narrowed the permissible scope of searches and seizures made as incidents to arrests. There three police officers went to Chimel's home with a warrant for his arrest for burglary but without a search warrant. Chimel's wife let the officers into the house where they waited some ten or fifteen minutes until he returned from work. Upon his return he was handed the arrest warrant, placed under arrest, and asked for permission to " 'look around.' " Chimel objected but the police officers nonetheless conducted a search of the entire house resulting in the seizure of various items of evidence which were used against him at his trial. The Supreme Court reversed Chimel's conviction holding that the search of his home after his arrest violated his

Fourth and Fourteenth Amendment rights because the scope of the search was unreasonable in the constitutional sense.

The Supreme Court reasoned in *Chimel* that the general[9] constitutional requirement that a search warrant be obtained "is not lightly to be dispensed with" and that the proper extent of searches and seizures made as incidents to arrests necessarily is limited by reference to the rationale which permits these warrantless intrusions. The Court said:

> When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape. Otherwise, the officer's safety might well be endangered, and the arrest itself frustrated. In addition, it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction. And the area into which an arrestee might reach in order to grab a weapon or evidentiary items must, of course, be governed by a like rule. A gun on a table or in a drawer in front of one who is arrested can be as dangerous to the arresting officer as one concealed in the clothing of the person arrested. There is ample justification, therefore, for a search of the arrestee's person and the area "within his immediate control"—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence.

> There is no comparable justification, however, for routinely searching any room other than that in which an arrest occurs—or, for that matter, for searching through all the desk drawers, or other closed or concealed areas in that room itself. Such searches, in the absence of well-recognized exceptions, may be made only under the au-

thority of a search warrant. The "adherence to judicial processes" mandated by the Fourth Amendment requires no less. 395 U.S. at 762–63, 89 S.Ct. at 2040 [footnote omitted]

The search and seizure in *Chimel* was found unconstitutional when tested by the principles stated by the Court. The search there clearly did not confine itself to Chimel's person and extended beyond the immediate area from within which he might have been able to seize or destroy evidence or from within which he might have been able to obtain a weapon to resist arrest, effect his escape, or endanger the safety of the arresting officers.

The seizure effected by Agent Coniglio in the case at bar also must be found unconstitutional when tested by *Chimel* standards. Defendant was arrested in the entrance area of a five-room apartment. Agent Coniglio permissibly could have searched defendant's person and seized any weapon or evidence found on him. Agent Coniglio also permissibly could have searched the area where the arrest was made and from within which defendant might have been able to obtain a weapon or destroy evidence. Instead of confining himself to the person of the defendant or to the area from within which the defendant might have been able to obtain a weapon or destroy evidence, Agent Coniglio instructed the defendant to reveal where else in the apartment any guns were kept. The result was the seizure of guns in one of the several rooms of the five-room apartment—defendant's bedroom—which was separate from the area within which the arrest occurred.

The Government takes the contrary position and argues that the decision in United States v. Hsu, 424 F.2d 1286 (2d Cir. 1970) is controlling and fully supports its stand that the seizure here was lawful under *Chimel* standards. Defendant Hsu was an ingenious schemer who defrauded various persons out of large amounts of money by persuading them,

among other things, that he had been a general in the Nationalist Chinese Army and a bodyguard and intimate of Generalissimo Chiang Kai-Shek, and that he had been entrusted by the Generalissimo with the safekeeping of a huge fortune. Hsu was arrested at the entrance door of his apartment. There the agent asked Hsu where he kept his pistol and the defendant led him down a long corridor to a cupboard where the gun was found. A few feet from the cupboard was a bedroom in which the agent observed lying on a desk what appeared to be another gun (it turned out to be a cigarette lighter shaped like a gun) and various papers. The agent searched the contents of the bedroom and seized various items of evidence which later were used against Hsu.

The arrest and search in the *Hsu* case occurred before *Chimel* was decided and the Court of Appeals applied pre-*Chimel* standards in upholding the search.[6] Strictly speaking, therefore, the *Hsu* decision is not applicable to the case at bar. The Court of Appeals in *Hsu*, though, also opined that even under *Chimel* the search would have been lawful. Nonetheless, *Hsu* does not suggest the decision in this case because the facts here and the facts in *Hsu* are significantly different in terms of the applicability of *Chimel*.

Superficially, the facts in *Hsu* and those in the case at bar would appear to fall within the same pattern. The cases, though, are not at all alike. The search and seizure in *Hsu* were prompted by a felt need for self-protection. The arresting agent in *Hsu* testified at the pre-trial suppression hearing that his first concern after effecting the arrest was to locate any weapons Hsu had, particularly a loaded revolver he was known

to carry in a shoulder holster and make no effort to conceal from his victims. It was this expressed concern of the agent to seize a loaded revolver in reasonable anticipation that Hsu might use it to resist his arrest which motivated the agent's query as to the location of the weapon. It was this selfsame concern which led the agent first to the cupboard and then to the nearby bedroom. Clearly the agent in *Hsu* reasonably and prudently was motivated by regard for his own safety.

In the case at bar Agent Coniglio instructed the defendant in the entrance area of the apartment to produce whatever guns the latter had on the premises. Unlike *Hsu*, however, there is nothing in the record here that suggests that Agent Coniglio's actions were motivated by a concern for his safety. Nor, for that matter, is there any suggestion in the record that Agent Coniglio had reason to be fearful. Further, there is nothing in the record to suggest that Agent Coniglio's actions were prompted by a need to prevent the destruction of evidence within defendant's reach. Defendant was arrested for unlawfully selling a gun, and so Agent Coniglio acted out of good intentions to uncover evidence which could be used against the defendant.

Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) and Sibron v. New York, 392 U.S. 40, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) are stop and frisk cases and as such are not squarely in point here. It is instructive, nonetheless, to contrast the results reached in these two cases. In *Terry* the seizure of a gun from the petitioner was upheld on the ground that the police officer there acted for reasons of self-protection. In *Sibron* the seizure of heroin

---

6. Prior to the decision in *Hsu* the Court of Appeals had decided that *Chimel* was not applicable to searches and seizures which occurred prior to the date of the *Chimel* decision. United States v. Valdes, 417 F.2d 335 (2d Cir. 1969), *cert. denied* 399 U.S. 912, 90 S.Ct. 2206, 26 L.Ed.2d 566 (1970) ; United States v.

Bennett, 415 F.2d 1113 (2d Cir. 1969), *cert. denied* 396 U.S. 852, 90 S.Ct. 113, 24 L.Ed.2d 101 (1969). The Supreme Court did not decide that *Chimel* was not retroactive until its recent decision in Williams v. United States, 91 S.Ct. 1148.

from the defendant's person was disapproved by the Court because the police officer clearly had proceeded as he did in order to seize narcotics. To be sure, *Terry* and *Sibron* involve important issues not touched upon by this brief paragraph. Still this basic distinction between these two decisions stands out and indeed the distinction was stated expressly by the Supreme Court in the *Chimel* opinion itself. 395 U.S. at 762, 89 S.Ct. at 2039–2040.[7]

Had Agent Coniglio searched defendant's apartment and then found the guns in the bedroom, the search would have been unlawful under *Chimel*. The result cannot be different simply because the agent instructed the defendant in the first instance to lead him to the evidence. Although the goal of uncovering evidence is a laudable one, nonetheless it must be pursued within the permissible limits. The warrantless search and seizure conducted in this case cannot, consistent with *Chimel*, be sustained as one that was within the permissible scope of a search and seizure incident to an arrest.

The motion to suppress is granted, the Government not having shown consent to the search and seizure, nor that the search and seizure was within the permissible scope of searches and seizures incident to lawful arrests, nor the applicability of any other recognized exception to the constitutional requirement that a search warrant be obtained.

Settle order on notice.

7. The Court said:
   Only last Term in Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 we emphasized that "the police must, whenever practicable, obtain advance judicial approval of searches and seizures through the warrant procedure," *id.*, at 20, 88 S.Ct. at 1879, and that "[t]he scope of [a] search must be 'strictly tied to and justified by' the circumstances which rendered its initiation permissible." *Id.*, at 19, 88 S.Ct. at 1878. The search undertaken by the officer in that "stop and frisk" case was sustained under that test, because it was no more than a "protective

\* \* \* search for weapons." *Id.*, at 29, 88 S.Ct. at 1884. But in a companion case, Sibron v. New York, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917, we applied the same standard to another set of facts and reached a contrary result, holding that a policeman's action in thrusting his hand into a suspect's pocket had been neither motivated by nor limited to the objective of protection. Rather, the search had been made in order to find narcotics, which were in fact found. [footnotes omitted] *See also* Williams v. Adams, 436 F.2d 30, 33 (2d Cir. 1970).