**UNITED STATES of America,**
**Appellee,**

**v.**

**Harry Thomas TITUS, Appellant.**

**No. 805, Docket 35156.**

United States Court of Appeals,
Second Circuit.

Argued July 13, 1971.

Decided July 15, 1971.

Anthony S. Kaufmann, New York City (Harry C. Batchelder, Jr., New York City, of counsel), for appellant.

Ronald L. Fancher, Asst. U. S. Atty. (H. Kenneth Schroeder, Jr., U. S. Atty., Buffalo, N. Y., of counsel), for appellee.

Before FRIENDLY, Chief Judge, and LUMBARD and OAKES, Circuit Judges.

FRIENDLY, Chief Judge:

Appellant was convicted on overwhelming evidence after trial before Judge Curtin and a jury, in the District Court for the Western District of New York, on a three-count indictment for bank robbery in violation of 18 U.S.C. § 2113(a), (b) and (d). He challenges the conviction on the sole ground that, after two suppression hearings, the Government was permitted to offer evidence obtained as a result of a warrantless nighttime arrest by FBI agents while he was in the apartment of his girl friend. He contends the evidence should have been excluded since the arrest was invalid because of absence of probable cause and for lack of a warrant which the agents had time to obtain, and also because, even if the arrest was valid, the evidence or some of it, was seized during an incidental search exceeding the limits imposed in Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969).

The bank robbery, perpetrated by two men wearing army fatigue jackets one of them armed with a sawed-off shotgun, occurred shortly after 5 P.M. on December 19, 1969. Tellers and customers described the appearance and physique of the robbers with great specificity and detail. A few days later Special FBI Agent Welch was contacted by an informant who had previously given information that had led to arrests and convictions; the informant named Lloyd Neville and appellant Harry Titus as the robbers. Between 3 and 4 P.M. on the afternoon of December 23, Welch and other agents visited the home of the head bank teller and exhibited a number of photographs to her. From one group of photographs she "positively" identified Neville as one of the robbers; from another she "tentatively" identified Titus as the man who had carried the gun.

The agents obtained a warrant for Neville's arrest and succeeded in arresting him at his home around 8:30 or 9 P.M. On being taken to the FBI office, he admitted participating in the robbery; shortly before midnight he identified Titus as his accomplice. Some further time was consumed while Neville explained that Titus was living at his girl friend's apartment and the agents located this on a city map. Without seeking to obtain an arrest warrant, a number of agents went to the apartment, arriving there around 1:30 A.M. After giving proper warnings of their identity and purpose, they entered— some through a front door, Agent Welch through the kitchen. The apartment was dark; Titus was found, nude and in a crouched position, with a sawed-off shotgun leveled at the agents. On command he lowered the gun, which the agents seized. One of the agents backed him against a wall and directed another to bring clothing. In the course of doing this the latter agent noticed and seized two army fatigue jackets of the type that had been described as having been worn by the robbers. Agent Welch, making his way back into the kitchen through which he had entered and had now lighted, found on the floor a considerable quantity of money, including some with straps bearing the name of the bank and some with straps bearing the name of one of the victimized tellers. This was seized. Agent Welch thought the money might have spilled onto the floor from a trash can he had knocked over upon first entering the darkened apartment.

Recital of the facts alone suffices to show the absence of merit in the contention of lack of probable cause. Whether or not the combination of the informant's report and the teller's "tentative" identification of Titus' photograph would have sufficed, Neville's positive statement was more than enough to tip the scales. To seek to assimilate the confession of a participant in a crime to the statement of an "informant" with no previous record of reliability, as appellant does, is mere semantics, and highly unconvincing semantics at that.

The argument with respect to the failure to secure an arrest warrant takes off from the statement in Jones v. United States, 357 U.S. 493, 499–500, 78 S.Ct. 1253, 1257, 2 L.Ed.2d 1514 (1958), which characterized as "a grave constitutional question" whether "the forceful nighttime entry into a dwelling to arrest a person reasonably believed within, upon probable cause that he had committed a felony, under circumstances where no reason appears why an arrest warrant could not have been sought, is consistent with the Fourth Amendment," but did not decide it. The recent Supreme Court case of Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), makes clear that the question is still open, id. at 474, 91 S.Ct. at 2043 (opinion of Stewart, J.), id. at 492, 91 S.Ct. at 2051 (concurring opinion of Harlan, J.). It is unnecessary for us to attempt to decide it here, since sufficient "reason appears why an arrest warrant could not have been sought" without unreasonable risk of Titus' escape. The very fact of the arrest of Neville, who told the FBI he had been at the apartment on two recent occa-

sions, created some risk that if Titus sought to get in touch with him and was unable to do so, he would become apprehensive and decide to get away. The risk was heightened by the fact that the Buffalo City Police had broadcast the news of Neville's arrest over their radio network. Almost immediately Agent Welch began to receive inquiries from the news media, which concerned him because of their potential effect not only on Titus who might get the news on an early morning local news broadcast, but also on another armed man suspected of having collaborated in a different bank robbery. Substantial time would have been required to prepare affidavits, to travel some 15 miles to the residence of one or the other of the two commissioners, to present the affidavits for consideration by the commissioner, and to return to make the arrest. Perhaps in the light of hindsight, all of this could have been done without Titus having escaped. But the Fourth Amendment does not require law enforcement officers to take such a nicely calculated risk of the escape of an armed robber even in order to make a nighttime arrest in a home. The FBI agents had demonstrated their respect for the Amendment when they obtained a warrant for Neville's arrest; they acted with equal consistency when they determined there was insufficient time to do this in Titus' case without taking an unjustified risk of his escape.

There was likewise no violation of *Chimel*. It is not contended that the agents could not properly seize the shotgun. Since they were bound to find some clothing for Titus rather than take him nude to FBI headquarters on a December night, the fatigue jackets were properly seized under the "plain view" doctrine. Welch was entitled to turn on the kitchen lights, both to assist his own exit and to see whether the other robber might be about; when he saw the stolen money, he was permitted to seize it. Everything the agents took was in their "plain view" while they were where they had a right to be; there was no general rummaging of the apartment, Harris v. United States, 390 U.S. 234, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968); United States v. Kee Ming Hsu, 424 F.2d 1286 (2 Cir. 1970). Nothing in the plurality opinion in Coolidge v. New Hampshire, *supra*, 402 U.S. at 464–473, 91 S.Ct. 2037–2041, is to the contrary; the seizures in this case met the test of "inadvertence" there outlined.

Affirmed.