UNITED STATES of America,
Appellee,

v.

Edward MAPP, a/k/a Sonny Woods,
Defendant-Appellant.

No. 611, Docket 72-2414.

United States Court of Appeals,
Second Circuit.

Argued Feb. 28, 1973.

Decided March 28, 1973.

Joel A. Brenner (Diller & Schmukler, New York City), for appellant.

Barbara Ann Rowan, Asst. U. S. Atty. (Whitney North Seymour, Jr., U. S. Atty., Richard J. Davis, Asst. U. S. Atty. for S. D. N. Y., on the brief), for appellee.

Before KAUFMAN, ANDERSON and MANSFIELD, Circuit Judges.

KAUFMAN, Circuit Judge:

We are called upon today to consider certain important questions of Fourth Amendment law.[1] After a trial by jury, Edward Mapp, also known as Sonny Woods, was convicted on three counts of violating federal narcotics laws, 21 U.S. C. §§ 841(a)(1), 841(b)(1)(A) and 846. Count 1 of a five count indictment charged Mapp, Alan Simmons, Linda Walters, Robert Clark and Robert Davis with conspiracy to distribute, and possess with intent to distribute heroin (the "conspiracy" count). Count 2 charged Mapp and Simmons with the sale of 14.82 grams of heroin on May 25, 1972 (the "sale" count). Count 4 charged Mapp, Walters and Clark with possession of approximately two kilograms of heroin on June 21, 1972 (the "possession" count).[2] Mapp was sen-

---

1. The Fourth Amendment provides:
 The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized.

2. Mapp was not named in Count 3, which charged Alan Simmons and Robert Davis with the sale of approximately 3.41 grams

tenced to seven years imprisonment, to be followed by three years special parole, on each count, sentences to run concurrently.[3]

The search and seizure here involved were conducted in the absence of a search warrant. Prior to trial, the district judge held a hearing on the defendants' motions to suppress two kilograms of heroin seized from the defendant Walters's apartment on June 21, by the Joint Task Force agents who made the arrests in this case. The district judge denied the motion to suppress and the evidence was admitted at trial against the defendants, including appellant Mapp. The only issue on this appeal, brought by Mapp alone, is whether the search and seizure here involved was consistent with the Fourth Amendment and, if not, whether Mapp's conviction on all three counts must be reversed. We conclude that the search violated the Fourth Amendment and that the evidence seized during the search should have been suppressed. But, for the reasons discussed below, we reverse only as to the "possession" and "conspiracy" counts and remand for resentencing. Mapp's conviction on the "sale" count is affirmed.

### I.

Inasmuch as the sufficiency of the government's proof at trial is not challenged in these proceedings, we need not catalogue all the evidence which may have led the jury to conclude that the appellant was guilty of the crimes charged. It is sufficient to indicate at this stage that a skillful investigation by the New York Joint Task Force, involving intensive surveillance and the use of

an undercover agent, disclosed that Edward Mapp was heavily engaged in the sale of narcotics in New York City. The facts, as narrated by Patrolman John Crowe of the Task Force at the suppression hearing, follow.

On May 17, 1972, Detective Octavio Pons, a New York City Police Officer acting as an undercover agent for the New York Joint Task Force, purchased heroin from Alan Simmons. Late in the evening, on May 24, Pons and Simmons met again, and drove to Sterling's Den Lounge, a bar in the Bronx. Unaware that he and Pons were being observed by Patrolman Crowe, Simmons entered the bar and emerged shortly thereafter with the appellant, Edward Mapp. After a few moments, Mapp instructed Pons to follow him. Mapp drove his own vehicle to the vicinity of 1925 Monterrey Avenue, arriving there, followed by Pons and Simmons, at approximately 12:15 A.M. on the morning of May 25. Simmons asked Pons for $1300, which Pons handed to him. Simmons counted the money and gave it to Mapp, who then entered the apartment building at 1925 Monterrey Avenue. Simmons then told Pons that Mapp had "taught him everything he knew about the narcotics business" and that Mapp was Simmons's "connection." Approximately fifteen minutes later, Mapp emerged from the building, walked to Pons's car, threw two envelopes into Simmons's lap, and departed. Simmons gave Pons one of the envelopes, which Pons and Patrolman Crowe field-tested later in the day. The officers' test indicated that the envelope contained heroin, an evaluation subsequently confirmed by laboratory analysis.

of heroin. Count 5, which charged Mapp, Walters and Clark with possession of cocaine was dismissed before trial on the government's motion.

3. Alan Simmons pleaded guilty and was sentenced to four years imprisonment to be followed by three years special parole. Robert Davis, named in Counts 1 and 3, fled the jurisdiction and has not been brought to trial. The case against Robert

Clark was severed and will not be prosecuted, according to the government. The conspiracy charge (Count 1) against Linda Walters was dismissed at the close of the government's case, and the jury failed to reach a verdict in her case on the possession count (Count 4). She was retried on October 30, 1972, before the Court, and convicted. She was sentenced to a term of probation.

Surveillance was continued on Mapp by Task Force agents on at least eight occasions between May 25 and June 21. Although the investigation revealed that Mapp did not live at the Monterrey Avenue address,[4] he was frequently observed entering the building between the hours of 9:30 P.M. and 1:30 A.M., often after making a tour of neighborhood bars in the Bronx where he had met with Simmons. Generally, Mapp arrived at 1925 Monterrey Avenue alone, and emerged between five and fifteen minutes later. On at least one occasion, however, Mapp was accompanied by an unidentified man; both entered the apartment building and remained there for a brief period of time. The unidentified individual exited first, "returned to his auto, . . . sat down behind the driver's wheel . . . bent forward and then . . . sat back straight and drove off," conduct which could be construed to indicate that the unidentified male may have placed something under his seat.

Shortly after midnight on the morning of June 21, 1972, appellant left a bar in the Bronx and drove to 1925 Monterrey Avenue. Mapp, who was carrying a brown paper bag, approximately the size of a shopping bag, was followed into the building by Investigator John Herritage. He saw Mapp greet Mrs. Linda Walters in the hallway of the building and accompany her to the doorway of apartment 1–F. Mapp then asked her, "Where's the gangster," and she replied, "He'll be here shortly." Mapp and Mrs. Walters entered apartment 1–F and locked the door from the inside. Investigator Herritage relayed this information to Crowe, who was in the street at the time conducting surveillance. Approximately ten minutes later, at 1:10 A.M., Mapp emerged from the building, empty-handed. He entered his automobile, and drove one block, when he was stopped by Task Force agents and arrested.

At approximately 2:00 A.M., Crowe, Herritage, agents of the Bureau of Narcotics and Dangerous Drugs and uniformed New York City policemen, six in all, entered 1925 Monterrey Avenue and knocked on the door of apartment 1–F. From the rear of the apartment a male voice inquired who was at the door and one of the patrolmen shouted that it was the police. The peephole was opened from inside and then closed. The officers heard "rapid footsteps to the rear of the apartment and then sounds of several footsteps from the rear of the apartment." After waiting for one or two minutes the officers broke down the door. Robert Clark, who was standing near the doorway, was immediately arrested. Crowe, with his gun drawn, entered the bedroom, observed Linda Walters in her nightclothes, and said, "You are under arrest and we want the package that Sonny[5] brought in earlier." Mrs. Walters pointed to a bedroom closet. A subsequent search of the closet revealed a brown paper bag containing two kilograms of heroin.

## II.

Mapp does not question the validity of his arrest on June 21, nor of the admission against him of the heroin sold and delivered by him to Detective Pons on May 25. His argument, rather, is leveled against the search of Linda Walters's apartment on June 21 and the admission at trial of evidence seized, as he urges, in violation of the Fourth Amendment. He contends also that the two kilograms of heroin taken from Mrs. Walters's apartment and admitted for purposes of the "possession" and "conspiracy" counts, had a "spill-over" effect on the "sale" count.[6] Mapp argues, therefore, that if the evidence was inadmissible on the "possession" and "con-

4. Mapp's residence was 3406 Ely Avenue in the Bronx.

5. As previously indicated, Mapp was also known as Sonny Woods.

6. After the Court denied the defendant's motion to suppress, Mapp moved for severance of the "sale" count. The motion was denied.

spiracy" counts, his conviction on all three counts should be reversed.

Concisely stated the appellant's position is that the Task Force agents did not have probable cause to arrest the occupants of apartment 1–F; that even if there was probable cause to arrest, the agents were required to secure a warrant before effecting a nighttime arrest in a dwelling; that even if the warrantless entry was otherwise legal, it became unlawful as a result of the failure of the officers to announce both their identity and purpose prior to entry; and, finally, that even if the initial entry and arrest were valid, the subsequent search was unlawful because conducted without a search warrant. We shall consider these arguments in order, after a preliminary inquiry into the problem of standing.

## A. Standing

The government did not challenge Mapp's standing to raise the Fourth Amendment issue at the suppression hearing, nor did it do so in its brief on appeal. Indeed, at oral argument, when the issue was first raised by the Court, the government conceded that under traditional principles of standing Mapp properly had asserted the Fourth Amendment claim. Nevertheless, we believe a brief comment on this rather complex question is appropriate at this time and may be of some aid to district judges.

 The Assistant United States Attorney frankly acknowledged that Mapp was the target of the search in this case. There is language in Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L. Ed.2d 697 (1960) which at least suggests that the "target" of a search is a "person aggrieved," Rule 41(e), F.R.Cr. P.,[7] and therefore has standing to challenge the constitutionality of that search. In Jones, Justice Frankfurter, writing for the Court, said:

In order to qualify as a "person aggrieved by unlawful search and seizure" one must have been a victim of a search or seizure, *one against whom the search was directed,* as distinguished from one who claims prejudice only through the use of evidence gathered as a consequence of a search or seizure directed at someone else.

362 U.S. at 261, 80 S.Ct. at 731 (emphasis supplied). The passage was cited approvingly in Alderman v. United States, 394 U.S. 165, 173, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969); *see also,* 18 U. S.C. § 2510(11), defining a "person aggrieved" by an unauthorized wiretap as "a person who was a party to any intercepted wire oral communication or a person against whom the interception was directed." But in view of Mr. Justice Fortas's separate opinion, concurring in part and dissenting in part, in *Alderman,* see 394 U.S. 165, 200, 89 S. Ct. 961, the "target of the search" doctrine must still be regarded as an open question.[8] In any event, we need not rely on that principle to grant Mapp standing in this case. *Jones* proposed

---

7. Rule 41(e), F.R.Cr.P., provides in pertinent part:

(e) Motion for Return of Property and to Suppress Evidence. A person aggrieved by an unlawful search and seizure may move the district court for the district in which the property was seized for the return of the property and to suppress for the use as evidence anything so obtained on the ground that (1) the property was illegally seized without warrant, or (2) the warrant is insufficient on its face, or (3) the property seized is not that described in the warrant, or (4) there was not probable cause for believing the existence of the grounds on which the warrant was issued, or (5) the warrant was illegally executed. . . .

8. The thrust of Mr. Justice Fortas's separate opinion, 394 U.S. at pages 206–209, 89 S.Ct. at pages 981–986, is that *Jones* "requires that we include within the category of those who may object to the introduction of illegal evidence 'one against whom the search was directed.' Such a person is surely 'the victim of an invasion of privacy' and a 'person aggrieved,' even though it is not his property that was searched or seized." 394 U.S. 208–209, 89 S.Ct. at page 985 (footnotes omitted). Our reading of the Court's opinion indicates the Court did not adopt Justice Fortas's view. Thus, it appears that this language in *Jones* must be read as a suggestion, not a conclusion.

two alternative and independent standing rationales, reaffirmed in Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), and nowhere since undermined. The petitioner in *Jones* was charged with having purchased, sold, dispensed and distributed narcotics, and, in a second count, with having facilitated the concealment and sale of narcotics. "Possession was the basis of the Government's case against petitioner." 362 U.S. at 258, 80 S.Ct. at 730. Narcotics were seized from an apartment belonging to a friend of Jones, which Jones was using at the time. The Court concluded that petitioner had standing to assert violations of the Fourth Amendment because he was legitimately on the premises when the apartment was searched. But more significantly, the Court ruled that, in any event, when illicit possession is the core element of the government's case, a defendant has standing to raise the Fourth Amendment claim without making the "preliminary showing of an interest in the premises searched or the property seized which ordinarily is required when standing is challenged." *Id.* at 263, 80 S.Ct. at 732. The Court's statement in *Jones* applies with full force to this case:

. . . [T]o hold that petitioner's failure to acknowledge interest in the narcotics or the premises prevented his attack upon the search, would be to permit the Government to have the advantage of contradictory positions as a basis for conviction. Petitioner's conviction flows from his possession of the narcotics at the time of the search. Yet the fruits of that search, upon which the conviction depends, were admitted into evidence on the ground that petitioner did not have possession of the narcotics at that time. The prosecution here thus subjected the defendant to the penalties meted out to one in lawless possession while refusing him the remedies designed for one in that situation. It is not consonant with the amenities, to put it mildly, of the administration of criminal justice to sanction such squarely contradictory assertions of power by the Government.

*Id.* at 263–264, 80 S.Ct. at 732. The Supreme Court concluded, as we do here, that "[t]he possession on the basis of which petitioner is to be and was convicted suffices to give him standing under any fair and rational conception of the requirements of Rule 41(e)." *Id.* at 264, 80 S.Ct. at 732. We hold to this view in light of the Court's statement in *Simmons, supra,* that, "When, as in *Jones,* possession of the seized evidence is itself an essential element of the offense with which the defendant is charged, the Government is precluded from denying that the defendant has the requisite possessory interest to challenge the admission of the evidence." 390 U. S. at 390, 88 S.Ct. at 974. Nothing announced in *Alderman, supra,* in any manner weakens the vitality of the *Jones* rule upon which we rely, *see* Combs v. United States, 408 U.S. 224, 227 n. 4, 92 S.Ct. 2284, 33 L.Ed.2d 308 (1972).[9] Since we have refused the gov-

---

9. *Combs* raised the question whether the petitioner had standing under Mancusi v. DeForte, 392 U.S. 364, 88 S.Ct. 2120, 20 L.Ed.2d 1154 (1968). The Court, in remanding for amplification of the record, confirmed that *Jones* remains operative law. At 408 U.S. 227 n. 4, 92 S.Ct. at 2286, the Court said:

The Court in *Mancusi* relied upon Jones v. United States [362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 supra], as having done away with "the requirement that to establish standing one must show legal possession or ownership of the searched premises." 392 U.S., at 369

[88 S.Ct., at 2124]. In *Jones,* the Court held that the petitioner then before it had standing and enunciated two rules as alternative grounds for its decision. First, the *Jones* Court ruled that the "possession on the basis of which [an accused] is to be . . . convicted suffices to give him standing under any fair and rational conception of the requirements of Rule 41(e)," Fed. Rule Crim.Proc.; second, the Court ruled that "anyone legitimately on the premises where a search occurs" has standing to challenge the legality of that search. 362 U.S., at 264, 267 [80 S.Ct.,

ernment's request, on recent occasions, to abandon or modify the standing principles articulated in *Jones* with respect to "possession" offenses, *see* United States v. Price, 447 F.2d 23 (2 Cir.) cert. denied 404 U.S. 912, 92 S.Ct. 232, 30 L.Ed.2d 186 (1971); United States v. Pastore, 456 F.2d 99 (2 Cir. 1972), we see no reason to reconsider the question. *Compare* United States v. Gargiso, 456 F.2d 584, 586, n. 3 (2 Cir. 1972) (appellant charged with possession of goods found during search has standing), *with* United States v. Sacco, 436 F.2d 780, 784 (2 Cir.) cert. denied 404 U.S. 834, 92 S.Ct. 116, 30 L.Ed.2d 64 (1971) (indictment did not charge possession, nor would proof of possession have been sufficient to support the charge.) We, therefore, conclude that since possession was "an essential element of the offense[s]," Simmons v. United States, *supra*, 390 U.S. at 390, 88 S.Ct. at 974, with which Mapp was charged, he falls within the category of persons given standing for Fourth Amendment purposes under United States v. Jones, *supra*.

### B. *Probable Cause*

██ Since one theory upon which the government relies to justify the warrantless search of Mrs. Walters's apartment is that the search was conducted incident to her arrest, the legality of that arrest is necessarily called into question. We conclude that there was ample probable cause to arrest. Mapp had been linked to the sale of narcotics as early as May 25, when Detective Pons purchased heroin from Simmons and Mapp. Simmons informed Pons at that time that Mapp was his "connection." After Pons gave Mapp $1300 for the

heroin, Mapp went into the apartment building at 1925 Monterrey Avenue, emerged shortly thereafter, and delivered two envelopes containing heroin to Detective Pons. On numerous occasions between May 25 and June 21, the date of arrest, Mapp was seen entering the building at 1925 Monterrey Avenue at odd hours of the evening, and early morning, always for brief periods of time. It was more than reasonable for the officers to believe that Mapp was using an apartment in the building as a heroin stash; all that was left for experienced officers to determine was the precise number of the apartment.[10]

At approximately 1:00 A.M. on June 21, 1972, Mapp entered 1925 Monterrey Avenue carrying a brown paper bag, and was met in the hallway by Mrs. Walters. As we have indicated, Mapp said, "Where's the gangster," and Mrs. Walters replied, "He'll be here shortly." Investigator Herritage had astutely followed Mapp into the building and observed him and Mrs. Walters entering apartment 1–F. Mapp left the apartment at approximately 1:10 A.M. without the package. Under the circumstances, the officers could justifiably have believed that Mapp had left heroin in the apartment and that the occupant or occupants were assisting Mapp in his criminal activities. All the information then available to the Task Force agents gave them more than ample probable cause to arrest.

### C. *The Warrantless Arrest*

Although, as a general rule, officers may arrest without a warrant upon probable cause to believe that a felony has been or is being committed *see e. g.*, 18 U.S.C. § 3052, it remains "a grave

---

at 734]. The Government has urged that we take the opportunity, said to be presented by the instant case, to re-examine the first alternative holding of *Jones.* Even assuming we were disposed to do so, the Court of Appeals did not, in the opinion it filed in this case, deal with the question whether the nature of the charge against petitioner brought his case within the coverage of the first

aspect of the *Jones* holding, and we decline to reach or consider issues not yet passed on by that court.

10. Patrolman Crowe had, prior to June 21, obtained a search warrant for apartment H, at 1925 Monterrey Avenue, believing it to be the suspect apartment. Subsequent investigation disclosed that there was no such apartment.

constitutional question . . . whether the forceful nighttime. entry into a dwelling to arrest a person reasonably believed within, upon probable cause that he had committed a felony, under circumstances where no reason appears why an arrest warrant could not have been sought, is consistent with the Fourth Amendment." Jones v. United States, 357 U.S. 493, 499–500, 78 S.Ct. 1253, 1257, 2 L.Ed.2d 1514 (1958). The doubts expressed by Justice Harlan in *Jones* have not been resolved, and the question remains open, particularly after the Court's recent decision in Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), *id.* at 480, 91 S.Ct. 2022 (Opinion of Stewart), *id.* at 492, 91 S.Ct. 2022 (Harlan concurrence). At least one court has concluded that nighttime entry into a dwelling place for the purpose of arrest may not be made without an arrest warrant, absent exigent circumstances justifying a warrantless entry, Dorman v. United States, 140 U.S.App.D.C. 313, 435 F.2d 385, 391 (1970) (*en banc*). Indeed, the instant case may in certain respects, present a stronger argument than *Dorman* for vindicating the Fourth Amendment's safeguard of privacy by requiring a warrant for a nighttime arrest in a dwelling. In *Dorman*, the Court explicitly found that the police did not intend, at the time of entry, to search for property. 435 F.2d at 391. Here, however, there is more than a suggestion that at least one purpose of the warrantless entry was to search the apartment for "the package that Sonny brought in earlier." And it is, of course, axiomatic that a home may not be searched without a warrant, notwithstanding probable cause, except in the most "jealously and carefully drawn" situations. Jones v. United States, 357 U.S. 493, 499, 78 S. Ct. 1253, 2 L.Ed.2d 1514 (1958).

▮ Nevertheless, the circumstances of this case permit us to leave resolution of this question for another day, as other panels of this Court have done. *See* Williams v. United States, 463 F.2d 1183, 1185 (2 Cir. 1972); United States v. Gaines, 460 F.2d 176, 178 (2 Cir. 1972), on remand from the Supreme Court, 404 U.S. 878, 92 S.Ct. 223, 30 L. Ed.2d 159 (1971); United States v. Titus, 445 F.2d 577, 578 (2 Cir.), cert. denied 404 U.S. 957, 92 S.Ct. 323, 30 L. Ed.2d 274 (1971). For here, there were sufficient reasons why an arrest warrant could not have been sought without running the risk of seriously jeopardizing the Task Force investigation. Mapp, who had just been arrested, was entitled to make one telephone call, a call he might have placed to Mrs. Walters, warning her of the imminent danger of arrest. Furthermore, the conversation between Mapp and Walters in the hallway of 1925 Monterrey Avenue indicated that the arrival of a man ("the gangster") was expected very shortly. There was a danger, if the agents had been required to secure a warrant, that narcotics would be delivered to the awaited visitor, and the evidence lost. It was also possible that Mapp planned to return to Mrs. Walters's apartment within a few hours; his failure to return, as a result of the arrest, might have alerted Mrs. Walters to possible danger, resulting in the destruction of evidence. We conclude, therefore, that the exigent circumstances of this case justified the warrantless nighttime entry and arrest. United States v. Titus, *supra*, 445 F.2d at 578–579. United States v. Davis, 461 F.2d 1026, 1029–1032 (3 Cir. 1972); Dorman v. United States, *supra*.

### D. *Failure to Announce Purpose*

Mapp argues that even assuming *arguendo* that there was probable cause and the arrest without a warrant was valid, the forcible entry, accompanied by a breaking down of the door to Mrs. Walters's apartment, was not preceded by the proper announcement. 18 U.S.C. § 3109 provides that an "officer may break open any outer or inner door or window of a house . . . to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance or when necessary to liberate

himself or a person aiding him in the execution of a warrant." [11] At least since Miller v. United States, 357 U.S. 301, 306, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958), the same standard has been applied to arrests made without warrant, on the basis of probable cause, *see also,* Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); Sabbath v. United States, 391 U.S. 585, 88 S.Ct. 1755, 20 L.Ed.2d 828 (1968). As we indicated in our *en banc* decision in United States v. Manning, 448 F.2d 992, 997 (2 Cir.), cert. denied, 404 U.S. 995, 92 S.Ct. 125, 30 L.Ed.2d 69 (1971), the common law rule codified in § 3109 has, over the years, been modified by judicial decision. In Ker v. California, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963), a case involving unannounced nighttime entry by law enforcement officials, even Mr. Justice Brennan, the dissenter from the Court's conclusion that the entry in question did not violate the Fourth Amendment, conceded that an unannounced nighttime entry was constitutionally permissible in certain instances:

> Even if probable cause exists for the arrest of a person within, the Fourth Amendment is violated by an unannounced police intrusion into a private home, with or without an arrest warrant, except
> (1) where the persons within already know of the officers' authority and purpose, or
> (2) where the officers are justified in the belief that persons within are in imminent peril of bodily harm, or
> (3) where those within, made aware of the presence of someone outside (because, for example, there has been a knock at the door) are then engaged in activity which justifies the officers in the belief that an escape or the destruction of evidence is being attempted.

*Id.,* at 47, 83 S.Ct., at 1636. The merger of this Fourth Amendment rule and the statutory standard announced in § 3109 was completed in Sabbath v. United States, 391 U.S. 585, 591, n. 8, 88 S.Ct. 1755, 1759, 20 L.Ed.2d 828, when the Court noted that "[e]xceptions to any possible constitutional rule relating to announcement and entry have been recognized, *see* Ker v. California, *supra,* [374 U.S.] at 47, [83 S.Ct. at 1636] (opinion of Brennan, J.), and there is little reason why those limited exceptions might not also apply to § 3109, since they existed at common law, of which the statute is a codification." This view was noted and adopted in our *en banc* decision in United States v. Manning, *supra,* 448 F.2d at 1002.

■ In the instant case, the officers announced their identity but did not state their purpose. We conclude, however, that the facts here fall within the third exception to the rule articulated by Mr. Justice Brennan in *Ker, supra.* After knocking and announcing their identity, the officers waited one or two minutes for the door to open. They heard rapid footsteps in the rear of the apartment. Under the circumstances, the officers could reasonably have believed that persons within the apartment were effecting the destruction of evidence. Accordingly, the forcible entry, after announcement of identity but without announcement of purpose, was justified.

E. *The Arrest and Search*

We have succeeded in tracing the steps of the Task Force agents into the Walters apartment and have concluded that, at least until that point, the officers had acted wholly within the command of the Fourth Amendment. We briefly recapitulate the subsequent events. Upon breaking down the door to apartment 1–F the officers encountered Robert Clark and immediately placed

---

11. 21 U.S.C. § 879, enacted in 1970, authorizes forcible official entry into a dwelling, during the day or night, to search for narcotics, but only if the entry is pursuant to a warrant. Since no such warrant was secured in this case, the statute is inapplicable.

him under arrest. Patrolman Crowe, upon entering the bedroom, came upon Mrs. Walters in nightclothes and robe. He said to her, with his gun in hand, "You are under arrest and we want the package that Sonny brought in earlier." Mrs. Walters pointed to a closet located in the bedroom. Crowe opened the closet door, saw a brown paper bag with a light manila envelope protruding from the side. There were three such envelopes which Crowe turned over to the custodian of evidence. Only then did Crowe inform Mrs. Walters of her *Miranda* rights. Investigator Herritage entered the bedroom, looked in the closet and found a fourth manila envelope in the closet. Subsequent chemical analysis indicated that the envelopes contained two kilograms of heroin.

■■ It is conceded that the search here in question was conducted without the authorization of a warrant. But, "the most basic constitutional rule in that [Fourth Amendment] area is that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.' The exceptions are 'jealously and carefully drawn,' and there must be 'a showing by those who seek exemption . . . that the exigencies of the situation made that course imperative.' 'The burden is on those seeking exemption to show the need for it.' " Coolidge v. New Hampshire, *supra*, 403 U.S. at 454–455, 91 S. Ct. at 2032 (citations omitted). The Fourth Amendment was designed to protect individual privacy and at the same time accommodate the legitimate needs of law enforcement. But "[w]hen the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or Government enforcement agent." Johnson v. United States, 333 U.S. 10, 14, 68 S.Ct. 367, 369, 92 L.Ed. 436 (1948). Finally, nothing in the Fourth Amendment remotely implies that officers who, for the purpose of arrest, have intruded, albeit lawfully, upon the privacy of an individual without an arrest warrant, may further invade that privacy by searching without a warrant, otherwise required by the Fourth Amendment, in derogation of law, *see* Coolidge v. New Hampshire, *supra*, 403 U.S. at 480, 91 S.Ct. 2022 (opinion of Stewart); Chimel v. California, 395 U.S. 752, 766, n. 12, 89 S.Ct. 2034, 23 L. Ed.2d 685 (1969).

■ Absent a warrant, the government assumes the burden of persuasion that at least one of the narrow exceptions to the Fourth Amendment warrant requirement applies to this case. The Government does not here suggest that a warrant was not needed because the officers were engaged in "hot pursuit," Warden v. Hayden, 387 U.S. 294, 87 S. Ct. 1642, 18 L.Ed.2d 782 (1967); nor does it attempt to justify the warrantless search under the "plain view" doctrine, Coolidge v. New Hampshire, *supra*. Moreover, the record does not disclose a fact pattern similar to the emergency situation which justified the warrantless intrusion in Schmerber v. California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966); nor, of course, does this case demand application of the special rules pertaining to searches of automobiles, Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925); Chambers v. Maroney, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970). We are left, then, with only two possible theories under which the warrantless search involved here may be upheld: that the search was legal because voluntarily consented to by Mrs. Walters, *see* Bumper v. North Carolina, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968); or that the search was valid because incident to a lawful arrest within the meaning of Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L. Ed.2d 685 (1969).

### 1. *Consent*

■ Although each case must turn on its own facts, *see e. g.* United States v. Gaines, 441 F.2d 1122, 1123 (2

Cir. 1971), the overarching principles which govern the law of consent are clear. Consent to a search, and the waiver of Fourth Amendment rights which it implies, must be "freely and voluntarily given," Bumper v. North Carolina, *supra*, 391 U.S. at 548, 88 S.Ct. 1788. The government bears the burden of proving waiver, a burden which is discharged only upon a showing of clear and convincing evidence, United States v. Marotta, 326 F.Supp. 377, 380 (S.D. N.Y.1971), affirmed in open court, 456 F.2d 1336 (2 Cir. 1972); United States v. Lewis, 274 F.Supp. 184, 187 (S.D.N. Y.1967; Judge Mansfield); Sherrick v. Eyman, 389 F.2d 648, 651 (9 Cir.), cert. denied, 393 U.S. 874, 89 S.Ct. 167, 21 L. Ed.2d 144 (1968). Waiver of a constitutionally protected interest and "acquiescence in the loss of fundamental rights" cannot be presumed, Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938), nor may it be lightly inferred, United States v. Gaines, 441 F.2d 1122, 1123 (2 Cir. 1971). An individual must have knowledge of the existence of a right before he is deemed to have waived it, *see* Bustamonte v. Schneckloth, 448 F.2d 699, 700 (9 Cir. 1971), cert. granted 405 U.S. 953, 92 S.Ct. 1168, 31 L.Ed.2d 230 (1972)[12] for "[a] waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege." Johnson v. Zerbst, *supra*. Finally, it is fundamental that "[w]here there is coercion there cannot be consent." Bumper v. North Carolina, *supra*, 391 U.S. at 550, 88 S.Ct. at 1792.

At the threshold, one question requires consideration. We have noted that no warnings of any kind were given by the Task Force agents to Mrs. Walters before she allegedly consented to the search of her bedroom closet despite the fact that she had already been placed under arrest. There have been, at the very least, hints or suggestions in the legal literature that a variant of the *Miranda* warnings, 384 U.S. 436, 86 S. Ct. 1602, 16 L.Ed.2d 694 (1966), required in the context of waiver of Fifth and Sixth Amendment rights, should be required when law enforcement agents seek a waiver of Fourth Amendment rights, *see* United States v. Nikrasch, 367 F.2d 740 (7 Cir. 1966); Note, Colum.L.Rev. 130 (1967). We have declined to embrace such a rule in the past, stating that "[t]o fulfill the purpose of the fourth amendment—controlling police conduct—it is unnecessary to adopt a rule that a search is per se invalid unless it is preceded by warnings as to fourth amendment rights. The courts are competent to determine whether valid consent has been given absent such warnings," United States ex rel. Combs v. LaVallee, 417 F.2d 523, 525 (2 Cir. 1969), cert. denied 397 U.S. 1002, 90 S.Ct. 1150, 25 L.Ed.2d 413 (1970); United States v. Marotta, *supra*. We decline to do so again today. Other courts are in agreement, taking the view that failure to advise a person of the right to withhold consent is simply one factor to be considered in the balance, *see e. g.*, Rosenthall v. Henderson, 389 F.2d 514, 516 (6 Cir. 1968).

■ Turning, however, to the circumstances of this case, and applying the general legal waiver principles discussed above, we cannot agree that there was here consent, "unequivocal, specific and intelligently given," United States v. Smith, 308 F.2d 657, 663 (2 Cir. 1962), cert. den. 372 U.S. 906, 83 S.Ct. 717, 9 L.Ed.2d 716 (1963), which amounted to a knowing and voluntary waiver of constitutionally protected rights. Instead, this case presents an instance of submission to official authority under circumstances pregnant with coercion.

The Task Force agents entered Mrs. Walters's apartment at approximately two o'clock in the morning, after break-

---

12. The case was argued before the Supreme Court on October 10, 1972. One of the issues considered was whether the government must substantiate verbal consent to search an automobile by a demonstration that the consent was given with knowledge that it could be withheld. 41 U.S. L.W. 3237 (1972).

ing down the door. Patrolman Crowe testified that he entered the apartment with his gun unholstered and that the gun was in his hand at the time he arrested Mrs. Walters. Mrs. Walters was dressed in a housecoat, with nightclothes on underneath it. Crowe stated that she looked "alarmed" when he entered the room. There were, according to the testimony, five or six officers in the apartment at the time Mrs. Walters "consented" to the search.

Under these extraordinary circumstances—a gun in hand, a breaking down of the door, an arrest, the hour (2:00 A.M.), the place (her bedroom)—the officers' failure to warn Mrs. Walters, after placing her under arrest, of her right to remain silent or to withhold consent to a search, takes on special significance. Although we do not hold that whenever a defendant has been taken into custody, law enforcement officials must warn the accused of his right to withhold consent to a search, we are also not required to ignore the observations made in *Miranda* concerning the relationship between custody, coercion and consent. *Miranda* noted that "the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will . . . ." 384 U.S. at 467, 86 S.Ct. at 1624. And by "custodial interrogation," the Court meant "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* at 444, 86 S.Ct. at 1612.

Mrs. Walters was undeniably in custody when Patrolman Crowe entered her bedroom, with gun in hand, and announced to her that she was under arrest. Then, without advising her of her rights, and without taking even minimal steps to establish an atmosphere of rela-

tive calm somewhat more conducive to the making of a knowing and intelligent decision, he stated, "We want the package that Sonny left earlier." Although the district judge, in ruling on the motion to suppress, believed the latter expression amounted only to a statement, and not a question, and that Mrs. Walters's response constituted a voluntary act of consent to the search, we cannot accept this view of the facts. We conclude that the statement here in question was an outright demand—without ifs, ands or buts—and the voluntariness of the "consent" that followed must be measured in light of that demand.

■ "[A]rrest carries its own aura of coercion [and] the burden upon the government to show voluntary consent is 'particularly heavy.'" Gorman v. United States, 380 F.2d 158, 163 (1 Cir. 1967). Simply stated, that burden was not carried here. Considering the totality of the circumstances, we are of the view that the agents here involved were required to take at least some minimal action designed to purge the situation of its coercive pressures.[13] Patrolman Crowe's demand, made, as noted, with gun in hand, could very reasonably have been understood by Mrs. Walters to mean that the officers intended to search the apartment whether they had permission to do so or not. Indeed, subsequent to the search of the closet, the officers did in fact search the entire apartment, even though, as officer Crowe conceded, he did not have Mrs. Walters's consent to conduct such a search. We conclude, even after considering the evidence in the light most favorable to the government, that it has not been shown, by clear and convincing evidence, that Mrs. Walters "consented" to the search and seizure. Her conduct was nothing more than the mere acquiescence in and submission to lawful authority which was condemned in *Bump-*

13. In *Gorman, supra,* the Court held that consent was voluntarily given when the accused, who had been arrested, agreed to a search after being asked whether he would object. The Court noted, however, that

the accused had twice been warned that he need not answer any questions. *See also,* United States v. Hsu, 424 F.2d 1286 (2 Cir. 1970) cert. denied, 402 U.S. 982, 91 S.Ct. 1643, 29 L.Ed.2d 148 (1971).

*er.* 391 U.S. at 549, 88 S.Ct. 1788; United States v. Marotta, *supra*, 326 F. Supp. at 381. Accordingly, we cannot say that, in response to an official demand, her act of pointing to the closet was a "voluntary" waiver in the constitutional sense.[14]

### 2. *Search Incident to Arrest*

Inasmuch as the search in this case cannot be justified on the consent principle relied upon by the district judge, the government advances the alternative argument on appeal that the search was justified because it was incident to a lawful arrest. The history of this doctrine has been inconsistent, to say the least, and its oscillations have been frequently charted *see, e. g.,* Chimel v. California, *supra*, 395 U.S. 755–765, 89 S.Ct. 2034. We must, however, apply the Court's latest pronouncement, and we find it in *Chimel*. There the Court held:

> When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape. Otherwise the officer's safety might well be endangered, and the arrest itself frustrated. In addition, it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction.

And the area into which an arrestee might reach in order to grab a weapon or evidentiary items must, of course, be governed by a like rule. A gun on a table or in a drawer in front of one who is arrested can be as dangerous to the arresting officer as one concealed in the clothing of the person arrested. There is ample justification, therefore, for a search of the arrestee's person and the area "within his immediate control"—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence.

Chimel v. California, *supra*, 395 U.S. at 762–763, 89 S.Ct. at 2040. Apart from the above noted exceptions, there can be "no constitutional justification, in the absence of a search warrant, for extending the search. . . ." *Id.* at 768, 89 S.Ct. at 2043.

At the outset we dispose of the notion that *Chimel's* "immediate control" test permits law enforcement agents to search the entire room in which an arrest takes place, without regard to whether, in the literal sense, the area searched was one "into which an arrestee might reach in order to grab a weapon or evidentiary items. . . ." Although the search in *Chimel* extended throughout the three-bedroom house, including the attic, garage, and small workshop, *id.* at 754, 89 S.Ct. 2034, the Court explicitly declined to distinguish

14. United States v. Gaines, 441 F.2d 1122 (2 Cir.), cert. granted, judgment vacated and remanded, 404 U.S. 878, 92 S.Ct. 223, 30 L.Ed.2d 159 (1971), on remand, 460 F.2d 176 (1972), is not to the contrary. There too, police, four in number, entered a dwelling in the early hours of the morning after breaking down the apartment door. One of the officers identified himself to Gaines, and informed him of a complaint against him, for passing counterfeit bills. A second officer identified himself to Gaines and asked Gaines for identification. Gaines pointed to a jacket resting on a coat rack approximately ten feet away, clearly visible from where he was standing, and said, "It is in my jacket." The officer reached into a pocket and discovered two counterfeit bills that were admitted in evidence at Gaines's trial. The Court, concluding that "each case must stand or fall on its own special facts," 441 F.2d at 1123, held that Gaines had consented to the search of his jacket.

The facts in *Gaines* diverge in critical aspects from those in the instant case. In *Gaines*, there had been no announcement of arrest prior to the request for identification. Gaines may have believed, therefore, that his arrest and a full-scale search might have been forestalled by directing the officers to his jacket. The officers identified themselves to Gaines and there was not the slightest suggestion that any one of them held a gun in hand at the time the request for consent was made. These distinctions indicate compelling differences in the cases.

between full-house searches and limited single-room searches, stating:

> It would be possible, of course, to draw a line between *Rabinowitz* [United States v. Rabinowitz, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653 (1950)] and *Harris* [Harris v. United States, 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399 (1947)] on the one hand, and this case on the other. For *Rabinowitz* involved a single room, and *Harris* a four-room apartment, while in the case before us an entire house was searched. But such a distinction would be highly artificial. . . . No consideration relevant to the Fourth Amendment suggests any point of rational limitation, once the search is allowed to go beyond the area from which the person arrested might obtain weapons or evidentiary items. The only reasoned distinction is one between a search of the person arrested and the area within his reach on the one hand, and more extensive searches on the other.

*Id.* at 766, 89 S.Ct. at 2041. If any doubt should linger after that passage, additional language in *Chimel*, directly applicable to this case, instructs that "[t]here is no . . . justification . . . for routinely searching any room other than that in which an arrest occurs—or, for that matter, for searching through all the desk drawers *or other closed or concealed areas in that room itself*." Id. at 763, 89 S.Ct. at 2040 (emphasis supplied).

 The record in this case reveals that the closet in which the heroin packages were found was closed at the time of search. Thus, the only justification for the search, absent a warrant, is that the closet was within the area of Mrs. Walters's "immediate control," within the meaning of *Chimel*. Officer Crowe testified, however, that he was standing between Mrs. Walters and the closet at the time he asked her for the package which Mapp had left earlier. At the time the demand was made, there were five or six officers in the one bedroom apartment, certainly more than sufficient manpower to prevent Mrs. Walters from reaching the closet. Unless Mrs. Walters were either an acrobat or a Houdini, *see* Hall, Kamisar, La Fave and Israel, Modern Criminal Procedure, 1972 Supplement 66, we cannot conceive how the closet could have fallen within the area of her immediate control. To say that the closet was an area into which she was able to reach, despite the fact that an armed officer stood between her and it, would, in effect, be to hold that a search of all the enclosed places in Mrs. Walters's bedroom would have been consistent with the Fourth Amendment—a result explicitly foreclosed by *Chimel*. Accordingly, we cannot say, based on the objective facts in the record, that the closet was within Mrs. Walters's area of immediate control within the meaning of *Chimel*.

Nor did the officers here involved point to any articulable reasons leading them to believe that Mrs. Walters was an especially dangerous person against whom extraordinary protective measures may have been required, or that the search was actually an attempt to secure an area which the officers, in good faith, subjectively believed was within Mrs. Walters's area of immediate control. Such a contention would have been inconsistent, to say the least, with the fact that the officers did not even attempt to search Mrs. Walters or the area that was objectively within her immediate control when they arrested her. Moreover, as we have indicated, after finding the package which Mapp had left in the apartment, the officers proceeded to search the entire apartment for other evidence. Thus, absent even the barest hint that these Task Force agents sought to narrow the search within the command of *Chimel*, we have no occasion to determine whether a good faith effort by law enforcement officials to limit the scope and intensity of a search incident to a lawful arrest would have had a bearing on the reasonableness of that search under *Chimel*. Cf.

United States v. Hsu, 424 F.2d 1286, 1288 (2 Cir. 1970), cert. denied 402 U.S. 982, 91 S.Ct. 1643, 29 L.Ed.2d 148 (1971).[15]

15. We have not been cited to any cases in this Circuit, nor has our own research disclosed any, that run counter to our decision. Since *Chimel* was not made retroactive, *see* Williams v. United States, 401 U.S. 646, 91 S.Ct. 1148, 28 L.Ed. 2d 388 (1971), few cases have reached this Court which have required application of the more exacting standard than that which applied under *Harris* and *Rabinowitz*. United States v. Manarite, 448 F.2d 583, 593 (2 Cir. 1971) did apply the *Chimel* test to a search incident to a lawful arrest, and upheld the search there in question. The circumstances of *Manarite*, however, are markedly different from those involved here. In *Manarite*, an appeal from convictions for conspiracy to transport obscene material in interstate commerce for purposes of sale, certain pieces of incriminating evidence were recovered from a bar within six inches of where the arrestee was standing at the time they were seized. Inasmuch as *Chimel* explicitly authorizes a search of closed drawers in front of the arrestee, 395 U.S. at 763, 89 S.Ct. 2034, 23 L.Ed.2d 685, the Court properly concluded that this seizure was incident to a lawful arrest. Other evidentiary matters were found on top of the bar, and were properly seized because in "plain view." Additional material was found "in closets to which the agents went at the request of [the arrestee] to get for her a dress and raincoat." 448 F.2d at 593. This seizure, obviously, was not justified under *Chimel's* "immediate control" test, but under a combined theory of consent—to go into the closet—and "plain view." Finally, other evidence was seized from an end table near which several unidentified persons were standing. The Court justified the search on the ground that "[t]he F.B.I. agents were justified in assuming that these persons might be accomplices of those arrested and hence might attempt to destroy evidence or procure a weapon on behalf of appellants." *Ibid.* This theory is, of course, consistent with *Chimel*, and with our understanding of it, but is wholly inapplicable to the facts in this case where no unidentified, suspected accomplices were found standing in Mrs. Walters's room or near her bedroom closet.

Nor does United States v. Titus, 445 F.2d 577 (2 Cir.) cert. denied, 404 U.S. 957, 92 S.Ct. 323, 30 L.Ed.2d 274 (1971), compel a contrary result. Although the appellant in that case contended that certain seizures violated *Chimel* because not incident to arrest, the seizures were upheld on the ground that "Everything the agents took was in their 'plain view' while they were where they had a right to be; there was no general rummaging of the apartment." 445 F.2d at 579. The facts in *Titus* were as follows:

The apartment was dark; Titus was found, nude and in a crouched position, with a sawed off shotgun leveled at the agents. On command he lowered the gun, which the agents seized. One of the agents backed him against a wall and directed another to bring clothing. In the course of doing this the latter agent noticed and seized two army fatigue jackets of the type that had been described as having been worn by the robbers. Agent Welch, making his way back into the kitchen through which he had entered and now lighted, found on the floor a considerable quantity of money, including some with straps bearing the name of the bank and some with straps bearing the name of one of the victimized tellers. This was seized.

It was conceded that the agents had a right to seize the shotgun from Titus's person. The Court justified the seizure of the fatigue jackets on the ground that the agents were under a duty to find clothing for Titus rather than bring him nude to the stationhouse. When one agent went to get Titus's clothing, he happened upon the jackets. That fact pattern clearly complied with the directive announced by the plurality opinion in Coolidge v. New Hampshire, *supra*, that the discovery of evidence in plain view must be "inadvertent." *Id.* 403 U.S. at 465 n. 24 and 466, 91 S.Ct. 2022. It cannot be said, in connection with the present case, that the officers were lawfully "present" in the closet inasmuch as they expressed no interest in securing proper clothing for Mrs. Walters's impending trip to the stationhouse, nor did she request them to do so. Moreover, inasmuch as the purpose of the entry into the closet, as announced by officer Crowe, was to find the package Mapp had left earlier, discovery of the package was not "inadvertent" within the meaning of *Coolidge*. We note, further, that since it is likely that persons will not normally be attired in street clothes when they are arrested during the early hours of the morning, a general rule which permitted officers to proceed, on their own initiative, without prior request from the arrestee, to closed clothes closets to select suitable dress for the arrestee, thereby triggering application of the "plain view" doctrine with respect to material in

### III.

Having concluded that the warrantless search of Mrs. Walters's apartment violated the Fourth Amendment, we hold that the evidence seized during the course of that search should have been suppressed at trial. Mapp urges that the admission into evidence of the two kilograms of heroin tainted his conviction on all three counts of the indictment in which he was named. We disagree. Although we are compelled to reverse his conviction for possession of heroin (Count 4), and his conviction for conspiracy, which charged possession of the two kilograms of heroin as an overt act (Count 1), we conclude that with respect to the conviction for sale of heroin on May 25 (Count 2), introduction of the heroin seized from Mrs. Walters's apartment on June 21 was harmless beyond a reasonable doubt. Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). There is abundant evidence in the record of Mapp's guilt on this count, including Detective Pons's account of the sale and delivery by Mapp, corroborated by Officer Crowe's surveillance, and the evidence of the 14.-82 grams of heroin itself. Neither interests protected by the Fourth Amendment, nor the defendant's right to a fair trial in accordance with due process, would be advanced by reversing the "sale" conviction. But, since it might be argued that Mapp's seven year sentence on the "sale" count may have been influenced by his conviction on the "possession" and "conspiracy" counts held invalid today, reconsideration of sentence may be appropriate, United States v. Hines, 256 F.2d 561 (2 Cir. 1958) cf. United States v. Febre, 425 F.2d 107,

113 (2 Cir.), cert. denied 400 U.S. 849, 91 S.Ct. 40, 27 L.Ed.2d 87 (1970). And although we have held that the Exclusionary Rule does not apply to the sentencing process, United States v. Schipani, 435 F.2d 26 (2 Cir. 1970), cert. denied, 401 U.S. 983, 91 S.Ct. 1198, 28 L. Ed.2d 334 (1971), we note that each case must be decided on its own facts, cf. Verdugo v. United States, 402 F.2d 599, 610–613 (9 Cir. 1968), cert. denied sub nom. Turner v. United States, 397 U.S. 925, 90 S.Ct. 931, 25 L.Ed.2d 105 (1970) and we leave this judgment to the discretion of the trial judge. Nor does our remand for resentencing on the "sale" count imply any views on our part as to whether the sentence should be modified because of our reversal of the possession and conspiracy counts. We leave the matter of sentence solely to the district judge's discretion.

---

the closet, would seriously undermine the limiting principle of *Chimel* in a manner we doubt was intended.

Finally, both United States v. Pino, 431 F.2d 1043 (2 Cir. 1970), and United States v. Hsu, *supra*, though intimating that even post-*Chimel* standards might have justified the searches there involved, were actually decided under pre-*Chimel* standards, and do not control the decision here. We find the Court's opinion in

United States v. Marotta, 326 F.Supp. 377 (S.D.N.Y.1971), affirmed in open court, 456 F.2d 1336 (2 Cir. 1972), a case raising consent and *Chimel* problems in the context of a post-arrest search made without prior warnings, particularly instructive. In that case the Court granted a motion to suppress, finding the warrantless search not justifiable under *Bumper* or *Chimel*.